IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.    **TAMMY G. REECE,** | ) | |
| | ) | |
|         **Plaintiff,** | ) | |
| v. | ) | CIV-16-81-KEW |
| | ) | |
| 1.    **FIRST UNITED BANK &** | ) | |
|       **TRUST a/k/a DURANT \*\* FIRST** | ) | |
|       **UNITED BANK AND TRUST** | ) | |
|       **COMPANY,** | ) | |
| | ) | **ATTORNEY LIEN CLAIMED** |
|         **Defendant.** | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

**COMES NOW** the Plaintiff, Tammy G. Reece, and for her Complaint in the above-entitled action, alleges and states as follows:

## PARTIES

1. Plaintiff, Tammy G. Reece, is an adult female resident of Pottawatomie County, Oklahoma.

2. Defendant First United Bank & Trust a/k/a Durant \*\* First United Bank and Trust Company, is an entity doing business in Bryan County, Oklahoma.

## JURISDICTION AND VENUE

3. This is a cause of action arising out of Plaintiff's former employment with Defendant based on claims of (a) gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (b) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); (c) retaliation for opposing unlawful discrimination in the workplace in violation of Title VII; (d) interference with and retaliation for use of leave protected by the Family

1

Medical Leave Act ("FMLA"); and (e) state law *Burk* tort.

4.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331.  Plaintiff's corresponding state law claim arises out of the same core of operative facts and jurisdiction over such claim is vested in this Court under 28 U.S.C. § 1367.

5.     All of the actions complained of herein occurred in and around Bryan County, Oklahoma.  Defendant is doing business in such county and may be served in said county.  Bryan County is located in the Eastern District of Oklahoma.  Wherefore, venue is proper in this Court under 28 U.S.C. § 1391(b).

6.     Plaintiff has exhausted her administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about June 18, 2015.  Plaintiff received her Dismissal and Notice of Rights letter from the EEOC dated December 30, 2015 (received by Plaintiff by mail thereafter), and has timely filed this action within ninety (90) days of receipt of the notice of right to sue.

## STATEMENT OF FACTS

7.     Plaintiff (who was born in 1964) began her employment with Defendant as a Teller on or around February 1, 1982.  She steadily advanced over the years and was ultimately promoted to Senior Vice President ("SVP")/Director of Operations.  In this role, Plaintiff was responsible for operations in Defendant's community bank locations.

8.     Throughout her thirty-three (33) years with Defendant, Plaintiff's job performance was at least satisfactory, if not excellent.  In her 2014 performance review issued by her supervisor, Executive Vice President ("EVP")/Chief Administration Officer William Fahrendorf, Plaintiff was rated overall 3.75 out of 5 (with several exceeds expectations sub-ratings) and given a pay increase.

And, in or around March 2015, Plaintiff received a $2,500 bonus for her exceptional performance on an acquisition for Defendant the previous month.

9. Despite her stellar performance spanning more than 30 years, Plaintiff was wrongfully terminated on or about April 23, 2015. Present during her termination meeting were Human Resources Director Toni Preston (in her 30s) and Fahrendorf. Reading from a previously prepared document, HR Director Preston stated that the reason for Plaintiff's termination was that it was in Defendant's best interest to part ways with Plaintiff. Preston stated that Defendant's "culture" was changing and that Plaintiff had exhibited unwillingness to change. Preston further alleged that Plaintiff was perceived as controlling and that employees had complained about her. Plaintiff asked Preston for specific examples of this alleged conduct, but Preston could provide none.

10. After her termination, Defendant indicated that Plaintiff allegedly engaged in conduct which did not conform with Defendant's values.

11. The proffered reasons for Plaintiff's termination were merely pretext based on Plaintiff's age, gender, use of federally-protected medical leave, and in retaliation for her opposition to unlawful employment and banking practices.

12. Before her termination, Plaintiff had not been disciplined. She was not advised of any employee complaints against her. And, she had been successful for over thirty (30) years at adapting to change.

13. Significantly, male executives have been accused of similar or worse conduct, but have not been terminated. For instance, EVP Stephen Phillips (in his 30s) has had multiple complaints filed against him, but has not been fired. The complaints include but are not limited to the sexual harassment of a female employee, inappropriate and intoxicated conduct while attending

3

banking seminars (paid for by Defendant) and borrowing money from another executive to hire a stripper. Similarly, other male executives engaged in inappropriate relationships with female employees, including extramarital affairs.

14. Despite these documented conduct issues (which are well outside Defendant's written "values," such as "put[ting] God first," "cherish[ing] family" and "liv[ing] with integrity"), these male employees were not terminated.

15. By way of further example, in or around early 2013, Plaintiff was verbally attacked by Director of Retail Banking Perry Atwood without repercussion. Specifically, during a meeting with over thirty (30) bank managers, Atwood was having difficulty explaining a new operations process. Employees began looking at Plaintiff for direction after Atwood could not answer their questions. Plaintiff stated that they would gather more information about the operation because there was still some confusion about the process. In response, Atwood yelled at Plaintiff "I've got this" while making aggressive movements toward Plaintiff.

16. After the meeting, several employees complained to CEO Greg Massey, EVP/Chief Banking Officer Scott Flowers, and Fahrendorf about Atwood's conduct. Plaintiff also reported Atwood's conduct directly to Flowers (Atwood's supervisor) and Fahrendorf. Yet, Atwood was not disciplined. Rather, Plaintiff was directed by Flowers to call several of the bank managers with Atwood, tell the bank managers that she shared fault in the incident and that she and Atwood had "put it behind [them]."

17. As to the issue of resistance to the new "culture," other male executives were publically vocal about their resistance to changes happening within Defendant's business, but were not fired. For instance, Bank Manager/President Loren Cronin was not terminated after repeatedly

commenting to others that he was not happy with the direction the bank was headed.

18. Defendant has consistently exhibited a gender-biased culture of male favoritism. In fact, current Chairman of the Board (and former CEO/President) John Massey ended an annual employee meeting by stating that he was proud of "all the fine young men" they had working for Defendant.

19. Moreover, of nine (9) "Leadership Team" members, only one is female (age 30). A majority of Defendant's executive officers (SVPs or higher) are male. And, female executive officers are often excluded from portions of executive officer meetings and social gatherings.

20. Plaintiff experienced other discriminatory treatment as well. In recent years, Defendant began asking Plaintiff if she would be willing to move to Durant, OK and work out of Defendant's corporate headquarters. Plaintiff, who had previously worked out of Shawnee, OK and lived in Tecumseh, OK, agreed to make this move in or around 2012. At that time, Plaintiff asked whether Defendant would provide any financial assistance for her relocation, as male employees had been given relocation funds on other occasions. Yet, Greg Massey denied Plaintiff's request.

21. Plaintiff observed other discriminatory employment practices based on gender. For instance, in or around January 2015, Banking Officer Dustin Keys (in his 30s) was promoted to a VP position. Promoting directly to a VP position without first holding an Assistant VP title was unusual. Further, a female Assistant VP with comparable responsibilities to Keys was in line for a VP promotion at that time. Plaintiff opposed this discriminatory practice. In fact, Plaintiff told Fahrendorf that this promotion was discriminatory because the female AVP was more qualified and deserving of a promotion than Keys and because Keys had recently been on a disciplinary probation. In response, Fahrendorf said, "I know." However, Keys was promoted and the female AVP was not.

22.     In addition, Plaintiff's termination occurred approximately three (3) weeks following her return to full-time work from a medical leave. Plaintiff's mother suffered a massive heart attack on or about March 11, 2015. Plaintiff immediately notified Fahrendorf that she would not be in the office the following day. Human Resources personnel was also aware of Plaintiff's need to care for her mother. Fahrendorf told Plaintiff to work from home, but did not advise her that she was entitled to take FMLA leave to care for her mother. And, Fahrendorf frequently contacted Plaintiff regarding work while she was with her mother. In fact, Plaintiff fielded several questions regarding the February 2015 acquisition during this time and worked on another project for Defendant's Choctaw Nation Program. At no time was Plaintiff offered FMLA to care for her mother.

23.     Plaintiff was also retaliated against for acting consistent with Oklahoma public policy and comparable federal regulations providing governance for banking institutions. These regulations, such as the Truth in Savings Act and Oklahoma Banking Code, are designed to protect consumers from unlawful business practices, including but not limited to misrepresentations in marketing and deposit disclosures. On several occasions, Plaintiff advised management, including but not limited to Fahrendorf, Flowers and Atwood, that Defendant was at risk of being non-compliant with such regulations to the detriment of Defendant's customers.

24.     For instance, on one occasion in or around March 2015, Plaintiff was contacted by a call center employee regarding a promotion sent out to Choctaw Nation tribal members and employees. The brochure advertisement promised an instant issue Visa debit card and $100 credit for opening a new account with Defendant. However, Defendant had not received approval from Visa to instant issue these cards when potential new customers began calling Defendant's call center asking to set up such accounts. Plaintiff took it upon herself to investigate the matter and obtain the

requisite approval from Visa for the promotion.

25. Once approval was obtained, Atwood asked whether each new account must be credited with $100. Apparently, the promotion was intended to provide the $100 only when the new account met certain criteria. However, the promotional brochure did not indicate that the $100 credit would only be issued subject to those criteria. Plaintiff informed Atwood (and others) that the $100 credit must be issued on each new account because the advertising brochure did not mention that the credit was subject to such criteria. This was consistent with marketing regulations set forth in the Truth in Savings Act.

26. On another occasion in or around April 2015, Plaintiff was asked to modify procedures requiring bank tellers to obtain officer approval before cashing checks in excess of $5,000. Plaintiff had instituted such procedure to protect customers and the bank from losses associated with counterfeit checks. After Plaintiff learned that Greg Massey spoke with SVP AJ Thompson about these procedures, Plaintiff approached Thompson and he said management felt the controls Plaintiff had in place were "crazy." Plaintiff explained this was due to risk of loss, but would discuss making changes if the bank was willing to take on such risk for itself and its customers.

27. Upon information and belief, Plaintiff's job duties are now being performed by a significantly younger male.

28. As a direct and proximate result of Defendant's actions, Plaintiff has suffered the injuries described hereafter.

### COUNT I - Title VII Gender Violations

For her first cause of action, Plaintiff incorporates all prior allegations and further alleges and

states as follows:

29. The matters alleged above constitute violations of Title VII of the Civil Rights Act of 1964 in the nature of gender discrimination and retaliation.

30. Plaintiff is entitled to relief under Title VII because she was female, qualified for her job, terminated, and her position was not eliminated after her termination.

31. Plaintiff is further entitled to relief under Title VII because she engaged in a protected activity by lodging internal complaints of gender discrimination, she suffered an adverse action, and, as shown above, there is a causal link between the protected activity and the adverse action.

32. As damages, Plaintiff has suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

33. Because the actions of the Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991.

## COUNT II - Title VII Retaliation

For her second cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

34. The matters alleged above constitute a violation of Title VII of the Civil Rights Act of 1964 for retaliating against Plaintiff for opposing discriminatory practices within the workplace.

35. Plaintiff is entitled to relief under Title VII because she engaged in a protected act by opposing discriminatory employment decisions of Defendant, she suffered an adverse action, and, as shown above, there is a causal link between the protected act and the adverse action.

36. As damages, Plaintiff has suffered lost earnings, past and future, emotional distress

and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

## COUNT III - ADEA

For her third cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows.

37. The matters alleged above constitute violations of the ADEA in the form of age discrimination.

38. Plaintiff is entitled to relief under the ADEA because, at all times relevant to this action, she was over the age of forty (40), was qualified for her job, was terminated, and her position was not eliminated.

39. As damages, Plaintiff has suffered lost earnings, past and future, and other equitable and compensatory damages allowed by the Civil Rights Act of 1991. Plaintiff is also entitled to liquidated damages based upon Defendant's willful conduct in violating the ADEA.

## COUNT IV - FMLA

For her fourth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

40. The matters alleged above constitute interference with and retaliation for Plaintiff's use and/or attempted use of medical leave in violation of the Family Medical Leave Act.

41. Plaintiff was entitled to medical leave because she required time off to care for her mother due to serious health conditions (as set forth above) and worked for Defendant (i.e., an entity with more than 50 employees within a 75 mile radius of Plaintiff's worksite), for more than one (1) year and for more than 1,250 hours within the one year prior to her need for leave.

42. Defendant interfered with Plaintiff's use of FMLA-qualifying leave by failing to

notify her of her rights and contacting her while she was out on medical leave caring for her mother.

43. Defendant retaliated against Plaintiff for her use of FMLA-qualifying leave by terminating her employment within close temporal proximity of her return to work from such leave.

44. As set forth herein, Defendant's actions were in willful violation of the law. Defendant was aware of the FMLA and the requirements contained therein, but willfully violated Plaintiff's FMLA rights.

45. As a direct and proximate result of Defendant's actions, Plaintiff has suffered injuries and is entitled to recovery of all damages, including, but not limited to, lost wages (past and future), liquidated damages (based on the willfulness of Defendant's violation of the FMLA), attorney fees and costs.

## COUNT V - *BURK* TORT

For her fifth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

46. The acts above-described constitute a violation of Oklahoma's public policy which prohibits wrongful termination and retaliation against a whistle-blower for performing an act consistent with a clear and compelling public policy, i.e., refusing to participate in an illegal activity; performing an important public obligation; exercising a legal right or interest; exposing some wrongdoing by the employer; and performing an act that public policy would encourage or, for refusing to do something that public policy would condemn.

47. Particularly, Plaintiff acted consistent with Oklahoma public policy, including but not limited to the Oklahoma Banking Code and U.S. Truth in Savings Act, by opposing practices of Defendant which were misleading to customers, in violation of such acts.

48.     Plaintiff has suffered injuries and is entitled to recovery all damages or other relief allowed by state law, including but not limited to, lost wages (past and future), emotional distress damages, punitive damages, and attorney's fees and costs.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court enter judgment in favor of the Plaintiff and against the Defendant and assess actual, compensatory, punitive damages, and liquidated damages, together with pre- and post-judgment interest, costs, attorney's fees and such other relief as this Court may deem equitable and appropriate.

**RESPECTFULLY SUBMITTED THIS 1st DAY OF MARCH, 2016.**

> s/Jana B. Leonard
> JANA B. LEONARD, OBA# 17844
> LAUREN W. JOHNSTON, OBA #22341
> LEONARD & ASSOCIATES, P.L.L.C.
> 8265 S. WALKER
> OKLAHOMA CITY, OK 73139
> (405) 239-3800        (telephone)
> (405) 239-3801        (facsimile)
> leonardjb@leonardlaw.net
> johnstonlw@leonardlaw.net
>
> JURY TRIAL DEMANDED
> ATTORNEY LIEN CLAIMED